

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RIGOBERTO NAVARRETE,          )
                              )
          Plaintiff,          )    No. 05 C 2066
                              )
     v.                       )    Magistrate Judge Arlander Keys
                              )
COMPASS GROUP, USA, d/b/a     )
CANTEEN VENDING SERVICES,     )
                              )
          Defendant.          )

## **MEMORANDUM OPINION AND ORDER**

Rigoberto Naverrete, who is Mexican, has sued his former
employer, Compass Group, USA, d/b/a Canteen Vending Services
("Canteen"), which, as its name suggests, services vending
machines for its clients. In his complaint, which was originally
filed in state court and then removed to this Court, Mr.
Navarrete alleges discrimination and hostile environment
discrimination based on his race and national origin. The case
is before the Court on Canteen's motion for summary judgment.

### **Factual Background**

Mr. Navarrete started working for Canteen in 1990 at the
company's Elmhurst facility. He was initially employed as a
"route driver," a job that involved primarily stocking and
restocking vending machines at certain locations along a single
assigned route. In 1998, Canteen promoted Mr. Navarrete to
"route jumper," a job that involved predominantly the same

servicing tasks, but on multiple routes, not just a single assigned route; route jumpers typically filled in for route drivers who were out sick or out on vacation, and would assume responsibility for servicing whatever route they were assigned on any given day. Route jumpers had the additional responsibility of performing work in Canteen's warehouse.

At Canteen, route drivers were supervised by a single customer service manager; route jumpers were supervised by whichever customer service manager was responsible for the route they had been assigned to service that day. Route jumpers were also supervised by the district operations manager, a position held at all times relevant by Robert Smith; Smith, in turn, reported to the regional manager, a job held at all times relevant by Michael Boylan. During the time that Mr. Navarrete held the job, Canteen employed a total of four route jumpers – Mr. Navarrete, Tom Wiora, Henry Williams, and Greg Guzior.

While working a route, route jumpers were required to enter into hand-held computers daily customer service data concerning what services they performed and where. Upon returning to Canteen after completing his route, the route jumper would then download the information from the hand-held computer into the company's main computer system; from there, the information was reformulated into reports known as "daily activity logs." Canteen evaluated a route jumper's performance by comparing his

2

route schedule to his daily activity logs; it was expected that the daily activity logs would show that the route jumper completed every stop that was listed on his route schedule for that day. An unexplained discrepancy between a route jumper's route schedule and his daily activity log could subject a route jumper to disciplinary action, as could a route jumper's failure to enter all of the customer service information into the hand-held computer after every service stop. A route jumper's performance was also evaluated using feedback from customers.

Beyond the company's employee evaluation process and criteria, the employment relationships at Canteen were also affected by a collective bargaining agreement. Canteen's employees, including route drivers and route jumpers, were unionized, members of the Chicago Truck Drivers, Helpers and Warehouse Worker's Union. The collective bargaining agreement in place at Canteen provided that covered employees could be disciplined or discharged only for "just cause" and that, except for serious offenses (including theft and offenses involving the use of alcohol or illegal drugs), when disciplining an employee, Canteen had to follow a "four (4) step progression disciplinary procedure." Collective Bargaining Agreement between Chicago Vending Services, a division of Compass Group USA, Inc., and Chicago Truck Drivers, Helpers and Warehouse Workers Union, October 1, 1998 through March 31, 2003, Article 23, Section 1

3

(attached as Exhibit E to Defendant's Rule 56.1 Statement). Step one of the process consisted of a first written warning; step two was a second written warning; step three was a final warning and suspension; and, at step four, the employee was subject to discharge. *Id.* To be subject to termination under this process, an employee must have received the four written warnings within a twelve-month period.

According to Canteen, during his tenure as a route jumper, Mr. Navarrete received a total of 13 disciplinary notices for deficiencies such as failing to follow instructions, insubordination, and failing to service machines properly. Mr. Navarrete disputes this contention, though the record on summary judgment does include more than half a dozen "employee counseling reports" noting predominantly deficiencies in Mr. Navarrete's servicing of customer accounts, as well as a general failure to follow directions. *See* Defendant's Rule 56.1 Statement, Exhibit F, which includes reports from September 8, 1999 (for failing to follow directions to service Brookfield Zoo); October 7, 1999 (for failing to service Saks 5th Avenue); October 21, 1999 (for failing to service all stops on route); October 22, 1999 (for failing to follow instructions for servicing the assigned route, and for failing to follow his supervisor's instructions); November 17, 2000 (for failing to service machines according to the route schedules, for leaving machines empty and for failing

4

to fully service some of the machines he did service); March 27, 2002 (for failing to follow the route schedule provided); and May 13, 2002 (for failing to service 14 locations at Tellabs and for failing to follow pre-dated route cards).

Specifically in terms of the "progression disciplinary procedure," the record shows that Mr. Navarrete received a written warning on September 30, 2002 for poor performance. *See* Defendant's Rule 56.1 Statement, Exhibit G. This warning arose out of Mr. Navarrete's handling, for a two week period beginning in early September 2002, of Route 486, the route regularly assigned to route driver Frank Bucaro, who was on vacation during that period. According to Canteen, when Mr. Bucaro returned from vacation, he found that Mr. Navarrete had failed to follow his instructions for servicing the route, and had generally left the route in a state of disarray. The Associate Counseling Report documenting the complaint, which is signed by Robert Smith, states that "Rigo leaving routes in unacceptable condition is a recurring problem. Complaints are received on a weekly basis and immediate improvement must be seen." *See* Exhibit G, p. 00073. Attached to the report is a document prepared by the route driver which documents the deficiencies he noted in the way Mr. Navarrete covered his route.

Mr. Navarrete denies that his performance with respect to Route 486 was in any way deficient, and he even goes so far as to

suggest that the company may have coerced the route driver to
fabricate deficiencies in Mr. Navarrete's performance and to
prepare the report outlining those deficiencies. At his
deposition, Mr. Navarrete testified that he thought the driver
had written the report because he wanted to save his own job; he
further testified that the reason he believed this was because
that same driver had later apologized to him. Navarrete
Deposition, pp. 89-93. On this basis, Mr. Navarrete challenged
the September 30, 2002 written warning through the union's
grievance process. The warning was upheld.

The record shows that Mr. Navarrete received another
Associate Counseling Report on May 27, 2003 for insubordination
and for neglect of his job duties. See Defendant's Rule 56.1
Statement, Exhibit H. This second warning arose out of Mr.
Navarrete's handling of Route 50 during the period from May 5,
2003 through May 8, 2003. A memo attached to the reports
indicates that, on May 5, 2003, Mr. Navarrete was told to
"collect" the machines at Sears by Tuesday May 6th, that, by May
8th, he had still not collected those machines, and that, when he
was asked why, he told his supervisor that it wasn't his job.
Id., p. 00085. The memo notes that

> [t]he Route Jumper is responsible for all the duties of
> a Regular Route Driver when they are running the route.
> Rigo [Mr. Navarrete] was given the information needed
> to know what his job duties were and he was directed by
> a supervisor to perform the duties. Rigo is familiar
> with the Route and knows the Sears - St. Charles

6

> location, in fact in this time period he visited the
> location and serviced only the beverage machines.
> Failure to collect the snack machines after being given
> a direct order constitutes Insubordination.

*Id.*

Mr. Navarrete admits that the machines in question had not been serviced as of May 7, 2003, but he denies that the machines had not been serviced as of May 8, 2003. He filed a grievance with the union based upon the May 27 warning, and, with the grievance, he included a memorandum outlining his side of the story. The memorandum states

> [o]n May 5, 2003, [I] was given an empty truck and on
> Tuesday it was the date for all the machines of Route
> 50 had to be filled, which is not possible because it
> is not enough time for the reason being that it is one
> and a half route. . . . On May 7, 2003, assistance was
> sent to me, which in other words means that the route
> was empty before I began running it and I certify that
> I am not guilty. I am requesting that if you want
> evidence you should speak to Ken Dravenack because he
> called his assistant that day of May 7th and told us to
> go to the office, he did not even ask to speak to me.
> I am requesting for this write up not to be in my
> record if that is that the Union is fair. According to
> managers, it is fair and when they fire someone, the
> drivers are really happy. I am writing this letter
> because I have my own family to take care of and
> support. I assure you that I filled those machines up
> and if there is proof of otherwise then why did they
> not ask me to show the machines empty the day of the
> write up. . . .

Defendant's Rule 56.1 Statement, Exhibit I, p. 00239. Notably, the memo makes no mention of any kind of discrimination – national origin or otherwise. The union upheld the disciplinary action.

7

The record shows that Mr. Navarrete received a third written warning on July 25, 2003, this time for failing to follow orders and for failing to meet a reasonable standard of efficiency. *See* Defendant's Rule 56.1 Statement, Exhibit J. The third warning arose out of Mr. Navarrete's handling, on July 9, 10 and 11, 2003, of Route 415, a route supervised by customer service manager Joe Sanchez. On July 9, 2003, Mr. Sanchez gave Mr. Navarrete a route schedule, which indicated the exact days on which specific customer's machines needed to be serviced, and indicated the types of services required at each location. On July 14, 2003, Canteen received complaints from two of the Route 415 customers concerning Mr. Navarrete's service. Customer service manager Tony Mandarino investigated the complaints, personally inspected the machines, and reported to district operations manager Smith that the machines at these locations were, indeed, in very poor condition. Mr. Smith conducted an investigation of his own and determined, based upon a comparison of Mr. Navarrete's daily activity logs and the route schedule Mr. Sanchez had given Navarrete, that Mr. Navarrete had not followed directions and had not made the stops he had been scheduled to make. Based upon this, on July 25, 2003, Mr. Smith issued a third written warning to Mr. Navarrete, and advised him that, because this was his third warning in less than a year, he was eligible for suspension.

8

Mr. Navarrete denies that he failed to properly service the accounts on Route 415. He appealed his suspension to the union and attached a memo that, for the first time, raises the issue of race. *See* Exhibit K to Defendant's Rule 56.1 Statement. In his memo, dated July 25, 2003, Mr. Navarrete wrote as follows:

> This is an unjust suspension. It is said on the detailed account that I am being suspended because the machines at Toys-R-Us and Loyola Maguire Center were in "very poor condition" I have been doing my job for the past 12 years and have not once been suspended or called on or about the conditions of any of the machines on my route. I highly believe that the only reason that I have been suspended is because I am a minority and not because of my work abilities. In the past two years my supervisors have been watching over me, constantly harassing me. I believe it to be some sort of tactic to make me quit. This is what they are looking for to be able to fire me within the next five weeks. I was told by my supervisor Ken Dravenack that it was better for me to quit than for me to get fired. I don't plan on quitting or getting fired. I've worked for this company for 12 years and I started from the bottom up. I don't want to lose my seniority.

*Id.* The union's grievance committee denied Mr. Navarrete's appeal and upheld the suspension, though it did persuade the company, "in the spirit of cooperation," to reimburse Mr. Navarrete for his lost time; the union also instructed Mr. Navarrete to "sit with the company and union to discuss his ability to perform the duties of a jumper." Defendant's Rule 56.1 Statement, Exhibit N. The record does not contain any evidence indicating whether that suggested meeting ever occurred.

According to Canteen, the final straw for Mr. Navarrete came in August 2003. At that time, from August 18 through August 21,

2003, Mr. Navarrete was assigned to cover Route 452, a route supervised by Jim Bearden. Because he was aware that Mr. Navarrete had had problems with previous route schedules in the past, Mr. Bearden prepared and provided Mr. Navarrete with a more user-friendly route schedule, one that was designed to maximize efficiency, minimize confusion, and eliminate unnecessary travel time. Despite the new and improved schedule, on August 21, 2003, Mr. Bearden received calls from two of the customers on Route 452 complaining that their vending machines were empty. After investigating the complaints and Mr. Navarrete's performance on August 18, 19, 20 and 21, Canteen determined that, with respect to some accounts, Mr. Navarrete had skipped them altogether, and that, with respect to others, he failed to service all of the machines at a given location. Mr. Navarrete admits that he failed to service several of the machines on the route, including but not limited to those of the complaining customers. But he contends that one of the managers deviated him from the route schedule initially provided by Mr. Bearden. He testified at his deposition that he could not recall who ordered him to skip routes or leave routes before servicing all of the machines on the premises. And he concedes that his daily activity logs for the period do not show that his route was modified or altered in any way.

Based upon the Route 452 debacle, on September 10, 2003,

10

Canteen issued Mr. Navarrete his fourth and final disciplinary action. On that date, district operations manager Robert Smith and regional manager Mike Boylan met with Mr. Navarrete and two of his union representatives. At that meeting, Canteen asked Mr. Navarrete about his deficiencies with regard to Route 452, but Mr. Navarrete was unable to explain why he had failed to follow the route schedule given to him by Mr. Bearden. Messrs. Boylan and Smith advised Mr. Navarrete that, because this was his fourth warning in less than a year, he was eligible for termination. According to Canteen, Messrs. Boylan and Smith offered to allow Mr. Navarrete to save his job by stepping back down to the route driver position, the job he had done before his promotion in 1998. Mr. Navarrete denies that at the September 10th meeting he was offered the choice of staying on as a route driver, though he admits that, at some point, another job was on the table. *See* Navarrete Deposition, pp. 129-131. A memo attached to the September 10, 2003 counseling report, reflects Canteen's version of events; it states that "Rigo was given the option to bid on a route position in order to avoid the Discharge step in his Progressive Counseling. Rigo did not take this opportunity given to him by the company." Defendant's Rule 56.1 Statement, Exhibit L, p. 00101.

At the close of the September 10 meeting, Canteen fired Mr. Navarrete. The notice of termination states that Mr. Navarrete

11

was fired for neglect of his job duties, for failure to follow direct orders during August 2003, and for similar misconduct as reflected in the written warnings issued September 30, 2002, May 27, 2003 and July 25, 2003. Mr. Navarrete appealed his termination to the union, but the union denied his grievance on October 6, 2003. *See* Defendant's Rule 56.1 Statement, Exhibit O. Thereafter, Mr. Navarrete took his complaint to the Illinois Department of Human Rights, where he filed a charge of national origin employment discrimination. On December 3, 2004, the IDHR issued a notice of dismissal for lack of substantial evidence. On March 3, 2005, Mr. Navarrete filed a discrimination complaint in the Circuit Court of Cook County. Canteen removed the case to the federal district court, the parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on August 23, 2005. The case is currently before the Court on Canteen's motion for summary judgment.

## Discussion

### A. Summary Judgment Standards

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also*

12

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, the non-moving party must offer more than "mere conclusory" allegations. *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998). *See also Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The non-moving party must offer more than a "metaphysical doubt as to the material facts."). The non-moving party will lose on summary judgment if he cannot present sufficient evidence to support each element of his case for which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, the Court will disregard all facts not properly supported by the record. *Brasic v.. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997).

## B.     Mr. Navarrete's Claims

Canteen seeks summary judgment on Mr. Navarrete's discrimination claim as well as his hostile work environment claim.

### 1.     National Origin Discrimination

Mr. Navarrete may prove his discrimination claim either by providing direct evidence of discrimination or by proceeding under the indirect, burden-shifting method of *McDonnell Douglas*

13

*Corp. v. Green*, 411 U.S. 792 (1973). Mr. Navarrete concedes that he has no direct evidence of discrimination. Under the indirect method, under *McDonnell Douglas*, Mr. Navarrete must first establish a prima facie case of discrimination; if he succeeds, Canteen then has a chance to offer a non-discriminatory reason for any adverse employment action it imposed; and if Canteen does so, Mr. Navarrete must then submit evidence that Canteen's explanation is simply a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Oest,* 240 F.3d at 612 (citations omitted).

To establish a prima facie case for discrimination, in violation of Title VII, Mr. Navarrete must show that: (1) he belongs to a protected class; (2) he was performing his job at Canteen to the company's satisfaction; (3) he suffered an adverse employment action; and (4) a similarly-situated employee who was not a member of a protected class was treated more favorably by Canteen. *See Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 897 (7th Cir. 2003)(citing *Stalter v. Wal-Mart Stores, Inc.,* 195 F.3d 285, 289 (7th Cir. 1999). Canteen argues that Mr. Navarrete's claim fails on the second and fourth elements; it argues that he cannot show that he was performing his job to Canteen's satisfaction, and that he cannot show that Canteen treated non-Mexican similarly-situated employees more favorably.

With regard to Mr. Navarrete's performance on the job, the

14

record shows that he was less than stellar in the role of route jumper. As already noted, the record contains half a dozen reports from the fall of 1999 noting deficiencies in Mr. Navarrete's servicing of customer accounts. According to the memo written by Robert Smith in connection with the September 30, 2002 warning, Mr. Navarrete's "leaving routes in unacceptable condition is a recurring problem" and the company received weekly complaints about Mr. Navarrete's job performance. See Defendant's Rule 56.1 Statement, Exhibit G, p. 00073.

Additionally, the record includes an affidavit from Mr. Smith, who supervised Mr. Navarrete when he was a route jumper, which states that Mr. Navarrete had an extensive record of poor customer service; according to Mr. Smith, Mr. Navarrete received four written warnings for not following directions and failing to perform the essential functions of his job during his final 12 months as a route jumper. Affidavit of Robert Smith, ¶¶28-29 (attached as Exhibit A to Defendant's Rule 56.1 Statement). Mr. Smith states that he issued the first three warnings and that he investigated the customer complaints that led to the fourth warning, which was issued by Mr. Smith's boss, Mike Boylan. He also states that he personally corroborated the customer complaints that led to the first three warnings; he compared Mr. Navarrete's daily activity logs to his route schedules and discovered that Mr. Navarrete had not followed his assigned route

15

schedules and that he had not completed every stop as assigned. *Id.*, ¶35. Mr. Smith further states that, when he asked Mr. Navarrete about the problems he discovered, Mr. Navarrete "did not provide a credible explanation for those discrepancies." *Id.*, ¶37.

Canteen also submitted an affidavit from Mike Boylan, who served as the Regional Manager of Canteen's Elmhurst facility when Mr. Navarrete was there. In his affidavit, Mr. Boylan states that, in August 2003, Bob Smith informed him that two customers had complained about Mr. Navarrete's performance and his failure to service their machines as scheduled, and that Mr. Smith showed him the evidence to corroborate Mr. Navarrete's on-the-job deficiencies. Affidavit of Michael Boylan, ¶¶10-12.

Canteen also submitted an affidavit from James Bearden, the customer service manager who supervised Mr. Navarrete when he was assigned to cover Route 452 during the period from August 18, 2003 through August 21, 2003. According to Mr. Bearden, on August 21, 2003, he received calls from two customers on that route complaining that their machines had not been serviced as scheduled. Affidavit of James Bearden, ¶9. Mr. Bearden states that he personally responded to those complaints by inspecting the machines, which he discovered clearly had not been serviced, and then by analyzing Mr. Navarrete's daily activity logs, which showed that Mr. Navarrete had not only failed to properly service

16

the machines in question, but that he had also failed to properly service the machines of several other customers as well. *Id.*, ¶¶10-13. Mr. Bearden states that he forwarded his findings to district operations manager Smith with a recommendation that Canteen discipline Mr. Navarrete for failing to follow directions and for failing to provide "accurate customer service." *Id.*, ¶14.

On the flip side, the record includes Mr. Navarrete's denials that he performed poorly. There is the memo Mr. Navarrete wrote on June 12, 2003 in response to the May 27, 2003 disciplinary report. In that memo, Mr. Navarrete does not deny that his performance was deficient as described in the disciplinary report, but he does attempt to explain his deficiencies. *See* Defendant's Rule 56.1 Statement, Exhibit I, p. 00239. There is also Mr. Navarrete's deposition testimony. Although he begrudgingly admitted at his deposition that, in some cases, he had failed to service machines on his route, he testified that he did so either because a supervisor told him to deviate to a different customer, or because a supervisor told him he had already put in too much time and he needed to come back to the warehouse. Navarrete Deposition, pp. 123-126. Based on this testimony – and giving Mr. Navarrete every benefit of the doubt – a jury might be able to find that Mr. Navarrete's performance problems may have been, at least at times, excused or not

17

entirely inconsistent with his employer's expectations.

But even if the Court could get past the question of whether Mr. Navarrete was performing his job to Canteen's satisfaction, Mr. Navarrete would still fall short on the prima facie case because he cannot show that any similarly-situated non-minority employee was treated more favorably than he was.  The Seventh Circuit has interpreted "similarly situated" to mean "directly comparable . . . in all material respects."  *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002).  "To determine whether two employees are directly comparable, a court looks at all the relevant factors, which most often include whether the employees (I) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications."  *Ajayi v. Aramark Business Services, Inc.,* 336 F.3d 520, 532 (7th Cir. 2003)(citing *Patterson,* 281 F.3d at 680).

At his deposition, Mr. Navarrete was asked to explain his allegation that Canteen treated its non-minority employees better than it treated him.  He made some general statements about how other jumpers similarly failed to fill up their machines and were not disciplined, but he was unable to come up with any specifics; he provided no names, no dates, no concrete examples.  *See* Navarrete Deposition, pp. 39-46.  Similarly, he testified that he

18

thought the other route jumpers were allowed to work overtime,
but that he was not. Again, however, he was unable to come up
with any specifics to support this allegation.  Navarrete
Deposition, pp. 47-51.  He testified that, as far as he knew,
route jumpers "Tom" and "Greg" were allowed to run two or more
routes so that they could pile up overtime pay, while Mr.
Navarrete was not permitted to work overtime.  See Navarrete
Deposition, pp. 54-55.  But he concedes in his briefs that Tom
Wiora had no record of problems arising from his performance on
his routes, and he concedes that Greg Guzior's disciplinary
record, although not entirely blemish free, was not comparable to
his.

     When pressed at his deposition to come up with names of
potentially similarly situated employees, Mr. Navarrete mentioned
Mr. Guzior, as well as two employees named Snell and Ullua.  See
Navarrete Deposition, pp. 139-140.  But, when pressed further to
support his contentions, he was forced to concede that Mr. Guzior
did not have a comparable disciplinary record, Navarrete Dep., p.
141.  And, though provided no further details on Snell or Ullua
at his deposition, he admits in his response to Defendant's Rule
56.1 Statement that Jerry Snell was a route driver, not a route
jumper, and that he, therefore, had fewer responsibilities.  Mr.
Navarrete has provided no additional information about Mr. Ullua,
or about how he was treated differently.  In fact, Mr. Navarrete

19

has not even offered any evidence concerning Mr. Ullua's national origin. Thus, at this point, the Court has no way of even knowing whether Mr. Ullua would qualify as a similarly situated non-minority employee. And, in any event, Mr. Navarrete has admitted that he does not know of a single route jumper who had a disciplinary record that was comparable to his; as a necessary corollary to that, he concedes that he does not know of a single employee who had a comparable record to his, but was nonetheless allowed to stay on the job. Specifically, when asked at his deposition if he knew of anybody that had a comparable disciplinary record as a route jumper that was not terminated, he responded "Not in all the years that I was there, no one." *Id.*, p. 116.

In short, Mr. Navarrete has offered no evidence from which a jury could reasonably conclude that Canteen treated him less favorably than it did similarly situated non-minority employees. He has failed to carry his burden with respect to the fourth element of his prima facie case. The Court, therefore, finds that summary judgment in Canteen's favor is appropriate on Mr. Navarrette's national origin discrimination claim.

2. <u>Hostile Work Environment</u>

To recover on his hostile work environment claim, Mr. Navarrete must show that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race or national

20

origin; (3) the harassment was sufficiently severe and pervasive that it altered the conditions of his environment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. *Mason v. Southern Illinois University at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000) (citing *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998).

Based on the record now before the Court, no reasonable jury could sustain Mr. Navarrete's hostile environment claim. When asked at his deposition about any facts he had to support a hostile environment discrimination claim, Mr. Navarrete testified that Mike Boylan told him he was not qualified to be a jumper, and that Jim Bernard told him that, if he didn't like what was going on at work, he could quit. Navarrete Deposition, pp. 58-59. He also testified that Bob Smith told him he was putting in too many hours. *Id.*, p. 60. When asked what facts he had to support his claim that any harassment was based upon his national origin, he testified: "It's easy to understand. Because I worked 13 years of my life and I never lost a route. That's the example. That's it." Navarrete Dep., p. 62. He also testified that he thought he was being singled out for being a minority because

> they were always behind me. And I wasn't doing a job that was so poor, that was the poorest of work in that company. And that I had the option to get out of that through that door whenever I wanted to. And the

21

supervisor told me it was better – it was better for me
to quit. It was much better for me to quit than to
have them fire me.

Navarrete Deposition, pp. 115-116.

First, the behavior Mr. Navarrete complains of is not
actionable. A few objectively benign comments simply cannot
sustain a hostile environment claim. The Seventh Circuit has
held that "isolated or innocuous incidents will not support a
hostile environment claim." *E.g., Drake v. Minnesota Mining &
Manufacturing Co.*, 134 F.3d 878, 885 (7th Cir. 1998)(citing
*McKenzie v. Illinois Department of Transportation*, 92 F.3d 473,
480 (7th Cir. 1996)). To be actionable, the harassment must be
"sufficiently severe or pervasive so as to alter the conditions
of the victim's employment and to create an abusive working
atmosphere." *Id.* Here, the alleged misconduct was neither
severe nor pervasive.

Second, there is no evidence to suggest that the comments
complained of had anything to do with race or national origin.
The most offensive of the comments – Mr. Boylan telling Mr.
Navarrete that he was not qualified to be a jumper – seems to
have nothing at all to do with race or national origin, and Mr.
Navarrete has offered nothing to link the comment to the fact
that he was Mexican. Nor is there anything in the record to
indicate that Mr. Navarrete took the comment, or any of the other
complained of comments, as an attack on his race or national

22

origin.

The record does include Mr. Navarrete's July 25, 2003 memo,
in which he states his belief that Canteen was disciplining him,
not because of his job performance, but because of his minority
status. See Defendant's Rule 56.1 Statement, Exhibit K. But a
conclusory accusation like that cannot, without more, sustain a
discrimination claim. And Mr. Navarrete has consistently
declined to offer any facts to explain the basis for his belief
that he was being targeted because he was Mexican. This would be
the time to come forward with such evidence if he has it. See
Celex Group, Inc. V. Executive Gallery, Inc., 877 F.Supp. 1114,
1125 (N.D. Ill. 1995)("A party opposing a motion for summary
judgment must set forth specific facts showing that there is a
genuine issue for trial . . . .")(citing Camelot Care Centers v.
Planters Lifesavers Co., 836 F.Supp. 545, 554 (N.D. Ill. 1993)).

When viewed in the light most favorable to Mr. Navarrete,
the evidence might raise at least an inference that the route
jumper supervisors were keeping close tabs on Mr. Navarrete's
performance. Indeed, from this evidence a reasonable jury might
- with some straining - even be able to find that Canteen was
riding him harder than some other route jumpers and was out to
see that he was fired. But, again, the record does not show -
and a jury could not find - that such treatment, if it existed,
could be in any way attributed to his race or national origin --

23

or, for that matter, to any other illegal basis. And that is
fatal to his claim. "Federal courts have authority to correct
adverse employment action only where the employer's decision is
unlawful, and not merely when the adverse action is unwise, or
even unfair." *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 697
(7th Cir. 2006).

## Conclusion

For the reasons explained above, the Court finds that Mr.
Navarrete cannot establish a prima facie case of national origin
discrimination. Similarly, the Court finds that Mr. Navarrete
cannot show that any harassment he may have suffered at Canteen
was (1) based on his race or national origin, or (2) so severe
and pervasive that it altered the conditions of his environment.
Accordingly, the Court finds that Canteen is entitled to summary
judgment on both Mr. Navarrete's discrimination claim and his
hostile environment claim. Canteen's motion for summary judgment
[#34] is granted.

Dated: October 31, 2006

ENTER:

ARLANDER KEYS
United States Magistrate Judge

24